IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| DOROTHY MAE HARRIS, | ) | CASE NO. 3:17-cv-00331 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Dorothy Mae Harris ("Plaintiff" or "Harris") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

On August 6, 2013, Harris protectively filed an application for DIB.[1]  Tr. 79, 154, 165,

271-277.  She alleged a disability onset date of August 8, 2012, (Tr. 79, 154, 165, 271), and she

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 12/4/2017).

alleged disability due to L4-5 spondylolisthesis and stenosis, lumbar disc bulge and radiculopathy L4-5 lumbar disc tear, and substantial aggravation of pre-existing spinal stenosis on the left (Tr. 154, 165, 179, 184, 312).[2]  After initial denial by the state agency (Tr. 179-182) and denial upon reconsideration (Tr. 184-186), on March 25, 2014, Harris requested a hearing (Tr. 187).  On March 27, 2014, Harris filed an application for SSI, also alleging an onset date of August 8, 2012.  Tr. 79, 302-307.  A hearing was scheduled before Administrative Law Judge Jonathan Eliot ("ALJ").  Tr. 206-233, 241-266.  At Harris's request, her SSI claim was heard at the same time as her DIB claim.  Tr. 106-108, 243, 267-268, 365.  The hearing was held on April 1, 2015.  Tr. 100-153.

On April 24, 2015, the ALJ issued an unfavorable decision (Tr. 76-99), finding that Harris had not been under a disability within the meaning of the Social Security Act from August 8, 2012, through the date of the decision (Tr. 79, 93).  Harris requested review of the ALJ's decision by the Appeals Council. Tr. 10.  On December 23, 2016, the Appeals Council denied Harris's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Harris was born in 1965.  Tr. 109, 271.  At the time of the hearing, Harris was single and living with her two adult daughters.  Tr. 110.  Harris graduated from high school and completed two years of college.  Tr. 112, 313.  She did not complete enough classes to receive a college degree.  Tr. 112.  Harris's past work included work at Walgreens.  Tr.  113, 319, 362.  While at

---

[2] During the pendency of the administrative review process, Harris reported other problems, including bladder problems and feelings of depression.  *See e.g.,* Tr. 166, 339.

Walgreens, she worked in the warehouse performing receiving and packing tasks. Tr. 113-116. Harris also worked as a cleaning supervisor at a mall. Tr. 116-117, 319, 362. Harris's supervisor at the mall wanted her to perform only supervisory tasks but Harris also performed cleaning tasks if her assistance was needed. Tr. 116-118. Harris also worked as a cook and cashier at a jeep plant. Tr. 118-119, 362. Harris stopped working at Walgreens on August 8, 2012. Tr. 119, 312, 313. She attempted to return to work at Walgreens in September 2012 but was only there for about four days. Tr. 119. She was unable to continue because of the pain in her back and legs. Tr. 120.

## B.     Medical evidence[3]

### 1.     Treatment records

On August 8, 2012, Harris was seen at St. Luke's Hospital – Occupational Health Services regarding a July 2, 2012, injury that occurred while she was working at Walgreens. Tr. 448-454. She was treated by Sheri Desmond, CNP. Tr. 451, 453. Harris relayed that "she was picking up a 25-pound tote from the floor and moving it laterally to the conveyor line when she felt a pain in her lower back." Tr. 452. Later, her pain started to radiate to her thighs and lower legs. Tr. 452. Harris indicated she had a prior work injury from 2005 that had been diagnosed as a muscle strain and eventually resolved with medication. Tr. 452. Harris consulted with Frame Chiropractic a few days earlier on August 6, 2012, regarding her injury. Tr. 392, 452, 455. St Luke's diagnosed Harris with lumbar strain. Tr. 453. She was provided prescriptions for Naproxen and Flexeril. Tr. 453. She was offered physical therapy but declined. Tr. 453.

---

[3] Plaintiff's arguments in this appeal relate to her physical impairments and past relevant work. She does not challenge the ALJ's findings regarding her mental impairments. Accordingly, the medical evidence summarized herein relates primarily to Plaintiff's physical impairments. Plaintiff's citations to the record are not entirely accurate. *See e.g.*, Doc. 13, p. 5 (FN 17 cites to Tr. 449 as being records from February 17, 2013. However, Tr. 449 is a clinic discharge summary from August 8, 2012). The undersigned has not searched the voluminous record to find records for which accurate citations have not been provided.

She preferred to continue with chiropractic treatments.  Tr. 453.  She was released to work on a modified basis.  Tr. 449-450, 459.

Harris started chiropractic treatment with Mickey E. Frame, D.C., on August 13, 2012. Tr. 392-393.  She continued to receive chiropractic treatments on a regular basis through at least September 2013.  Tr. 393-423, 470-472, 476-493, 510-519, 529-534, 544-548, 550, 552, 558-565, 594, 599-602, 609-612.[4]  As part of Harris's workers compensation claim, from August 2012 through September 2013, Dr. Frame completed a number of reports regarding Harris's ability to work, indicating that she could return to work but with restrictions.  Tr. 458, 464-469, 473-474, 498-499, 508-509, 526-527, 536-537, 542-543, 570-571, 578-579, 589-590, 597-598, 614-615, 621-622.  Restrictions included working 5 hours per day for a total of 25 hours per week; having only an occasional ability to perform postural limitation such as bending, squatting, kneeling, twisting and turning; no climbing; lifting and carrying restrictions (occasionally lifting/carry up to 20 pounds and frequently lifting up to 10 pounds); pushing and pulling restrictions (occasionally pushing/pulling up to 25 pounds).  *See e.g.,* Tr. 468, 498, 508, 542, 589, 621.

On October 25, 2012, per Dr. Frame's referral, Harris had an MRI of her lumbar spine. Tr. 424-425.  The MRI report impressions were (1) posterior annular bulging at L4-5 by 2-3 mm compressing the thecal sac and contacting the L5 nerve root; (2) posterior annular bulging at L5-S1 by 2 mm contacting the thecal sac; (3) mild bilateral foraminal stenosis at L4-5; mild to moderate right-sided and mild left-sided foraminal stenosis at L5-S1; clinical correlation regarding L4 and/or L5 radiculopathy is advised; (4) posterior annular bulging at L4-5 centrally and just to the left; annular tears documented as potential pain generators (discogenic pain); (5)

---

[4] There are numerous duplicative treatment records throughout the administrative transcript.

multilevel spondylosis – moderate at L5-S1 and mild at L4-5; and (6) uterine fibroids suggested but uterus only partially visible. Tr. 425.

Also, per Dr. Frame's referral, on December 12, 2012, Harris had an EMG/NCV study performed by Dr. Mahmoud S. Mohamed, MD, MANN, of the Comprehensive Neurology and Headache Center. Tr. 426-427. The EMG was performed to "rule out nerve damage, especially lumbar radiculopathy or possible neuropathy." Tr. 426. The study was abnormal showing electrodiagnostic evidence of a left, mild chronic L4-5 lumbar radiculopathy, which Dr. Mohamed indicated should explain Harris's shooting pain down the left, lower extremity from her lumbar spine. Tr. 427.

On June 3, 2013, Harris presented to the emergency room at Mercy St. Anne Hospital ("St. Anne's") complaining of low back pain with numbness radiating into her left leg. Tr. 377-383. Tr. 377. She reported that the numbness had started two days prior. Tr. 377. Harris relayed that a neurologist and orthopedic surgeon had both recommended surgery for bulging discs but workers compensation had not approved her for surgery. Tr. 377. Dr. Erich R. Pontasch, MD, the attending physician, diagnosed lumbar strain with radiculopathy. Tr. 378-379. In the emergency room, Harris was medicated on Decadron, Dilaudid, and Phenergan and was discharged with instructions to take Motrin, Percocet, Flexeril, and a Medrol Dosepak as ordered. Tr. 378, 381, 382.

Harris returned to St. Anne's on September 13, 2013, with complaints of back pain. Tr. 385-390. On examination, Harris had paralumbar muscle spasms, greater on the right than left and positive straight leg raise on the left, otherwise her neurovascular motor function was normal. Tr. 385. Harris was medicated at the emergency room with Decadron, Dilaudid, Phenergan and Norflex and discharged on a Medrol Dosepak, Percocet and Robaxin. Tr. 385.

Harris's diagnoses were lumbar strain with radiculopathy and acute exacerbation of chronic back pain. Tr. 385.

Harris was seen again at St. Anne's on December 26, 2013, with complaints of low back pain, bilateral leg pain, and right arm pain. Tr. 712-718. A physical examination showed no midline tenderness of the C spine, thoracic spine or lumbosacral spine; good muscle strength and tone in the upper and lower extremities, good grip strength bilaterally; full range of motion of the upper and lower extremities without any deficit; no swelling to the right forearm but there was tenderness over the anterior aspect of the right forearm. Tr. 713. The emergency room diagnosis was exacerbation of chronic pain. Tr. 713, 717. Harris was medicated at the emergency room with Toradol and Norflex. Tr. 713. She was discharged with Percocet and instructed to follow up with pain management for further evaluation. Tr. 713.

On July 18, 2014, Harris saw Dr. Ahmad Zakeri, MD, for a consultation regarding her chronic back pain and pain down her legs, more on the left than right. Tr. 667-668. Harris reported experiencing incontinence starting about three months after her work-related injury and using a cane to get around for the prior year and a half. Tr. 667. On examination, Harris had exquisite tenderness on palpation of all soft tissues in the lower back and mid-lumbar spine; "[r]ange of motion of the hip [was] done fairly well with discomfort on any movement[;]" straight leg raise caused hamstring tightness; she walked with a cane; strength was intact on manual testing; reflexes were symmetrical in the knees and ankles; and sensations were grossly intact to light touch, pinprick and proprioception. Tr. 667. Dr. Zakeri indicated that the MRI imaging showed a "collapsed disc and MODIC type II changes at L5-S1 with moderate to severe bilateral foraminal stenosis . . . [and] a minimal disc bulge at L4-L5." Tr. 667-668. Dr. Zakeri

did not have the EMG/NCV study results to review but indicated he would try to obtain them. Tr. 668. Dr. Zakeri recommended a left selective L5 nerve root injection. Tr. 668.

On August 13, 2014, per Dr. Zakeri's recommendation, Harris saw Dr. Vivek Trivedi, MD, of Advanced Pain Management for an evaluation. Tr. 641-645. Dr. Trivedi's physical examination showed tenderness to palpation in the lumbosacral spine, bilateral sacroiliac joint area and bilateral paraspinal area; pain on lumbar flexion to 45 degrees; pain on lumbar extension to 10 degrees; positive straight leg raise at 60 degrees; positive Patrick sign bilaterally; motor function 5/5 bilaterally in upper and lower extremities; and sensory function grossly intact. Tr. 641. Dr. Trivedi assessed lumbar bulging disc, lumbar degenerative disc disease, lumbar facet syndrome, and sacroiliitis. Tr. 642. Dr. Trivedi recommended and scheduled a caudal epidural steroid injection and bilateral sacroiliac joint injection. Tr. 642. Dr. Trivedi also indicated that a bilateral facet joint injection might be considered if Harris's pain persisted and physical therapy for low back muscle stretching and strengthening would be considered after the nerve block. Tr. 642.

On August 19, 2014, Dr. Trivedi performed a left L5 selective nerve root block. Tr. 640. Thereafter, Dr. Trivedi performed a bilateral sacroiliac joint injection on September 2, 2014, (Tr. 637), and a right facet injection at L3-L4, L4-L5, and L5-S1 on September 16, 2014 (Tr. 636).

Harris attended physical therapy from August 26, 2014, through September 4, 2014. Tr. 654-657. During Harris's physical therapy sessions it was noted that she ambulated with a straight cane. Tr. 655, 656. On September 16, 2014, Harris was discharged from physical therapy because surgery was scheduled for October. Tr. 654. At that time, she had attended four physical therapy sessions and her discharge summary reflected no change in her condition. Tr. 654.

On September 8, 2014, Dr. Zakeri saw Harris for follow up.  Tr. 666.  Dr. Zakeri noted that the selective nerve root injection had helped her with her leg pain and the sacroiliac joint injection had helped her groin discomfort and her back pain.  Tr. 666.  However, Dr. Zakeri indicated that Harris was continuing to have significant pain in her back, more on the left than right.  Tr. 666.  Dr. Zakeri observed that straight leg raising caused hamstring tightness, her strength was intact, and her sensation was grossly intact.  Tr. 666.   Dr. Zakeri recommended a surgical decompression and fusion.  Tr. 666.

On October 3, 2014, Dr. Zakeri performed various surgical procedures.  Tr. 663-664. The procedures performed included a minimally invasive pedicle screw fixation; a left L5 Gill procedure, L5 foraminotomy, L5-S1 diskectomy, and transforaminal lumbar interbody fusion; graft preparation; and microdissection.  Tr. 663.

A few weeks after her surgical procedures, Harris saw Dr. Zakeri on October 29, 2014, for follow up.  Tr. 660.  Dr. Zakeri noted that Harris was having severe pain that was increasing in the back and left leg; she was on Lyrica; her strength and sensation were intact; and straight leg raising caused some hamstring tightness.  Tr. 660.  Per Dr. Zakeri's recommendation an MRI was taken.  Tr. 660.  Dr. Zakeri reviewed the MRI, noting that there was evidence of fluid accumulation and subcutaneous tissue that appeared to be more of a liquefied hematoma and there was no evidence of infection or encroachment by the hardware.  Tr. 660, 661-662.  Dr. Zakeri noted that he had adjusted Harris's brace, which she had been wearing too high, and that the adjustment significantly helped her.  Tr. 660.  Dr. Zakeri indicated that he wanted to continue to monitor Harris's progress and that x-rays would likely be obtained in a month.  Tr. 660.

A lumbar spine x-rays taken on December 3, 2014, showed Harris's fusion at L5-S1.  Tr. 658.  The flexion and extension views did not show gross instability or abnormal translation of

vertebral bodies.  Tr. 658.  Vertebral body morphology was within normal limits without any acute fractures.  Tr. 658.  That same day, Dr. Zakeri saw Harris and indicated that Harris seemed to be "doing much better."  Tr. 659.  "Neurologically her left foot [was] working."  Tr. 659. Harris was using an air boot that helped her with her spasms and her incision had healed well. Tr. 659.  Dr. Zakeri reviewed the x-rays, noting that they showed good alignment; hardware and grafts were in place; and there was no abnormal movement on flexion and extension.  Tr. 659. Dr. Zakeri felt that, overall, Harris had done well.  Tr. 659.  Dr. Zakeri wanted her to start therapy for her lower back, both land and water.  Tr. 659.  Harris was agreeable to starting therapy.  Tr. 659.

On December 15, 2014, Harris had a physical therapy evaluation at Center for Health Services Total Rehab.  Tr. 725-729.  Harris arrived at the evaluation using a rolling walker, cam boot on her left foot and a back brace.  Tr. 726.  Harris "transferred sit to/from stand with modified independence" and she "was modified independent with gait/ambulation for 100 feet." Tr. 726.  Her ambulation was limited by her leg pain.  Tr. 726.  Harris was using a hospital bed at home.  Tr. 726.  The physical therapist recommended physical therapy three times each week for six weeks.  Tr. 728.  Harris continued with physical therapy through early 2015.  Tr. 730-731, 732-734, 735-737, 738-740, 741-743, 744-748, 749-751, 819, 864-869, 870-875.  In January 2015, Harris reported that she felt her spasms had decreased since starting water therapy. Tr. 744.  She also felt stronger and that she was able to walk a little further.  Tr. 744.  She was still having pain in her back and left leg and having problems with numbness in her toes.  Tr. 744.

On December 29, 2014, Harris saw Dr. Swapna Palla, MD, to establish a primary care relationship.  Tr. 907-911.  Harris recounted her medical history, including her recent lumbar

fusion, physical therapy and mental health treatment.  Tr. 907.  Harris indicated she was taking

Lyrica and tizanidine for muscle spasms.  Tr. 907.  She was also wearing a leg air boot which

was helping.  Tr. 907.  Harris reported back pain and back stiffness.  Tr. 908.  On examination,

Dr. Palla observed lumbar spine tenderness, abnormal lumbar spine range of motion and use of a

walker.  Tr. 909.  Dr. Palla assessed Type II diabetes mellitus (chronic, controlled), lumbar

spondylosis (chronic, not controlled), and obesity (chronic, not controlled).  Tr. 910.  Dr. Palla

counseled Harris on weight management strategies, nutrition and physical activity.  Tr. 910.

Harris saw Dr. Palla again in February 2015 for follow up.  Tr. 901-906.  Harris complained of

urinary incontinence.  Tr. 901, 903.  She was also requesting a refill on her pain medication.  Tr.

903.  On physical examination, Harris showed lumbar tenderness to palpation and a decreased

range of motion due to pain.  Tr. 903.  Dr. Palla provided recommendations to address

complaints of urinary incontinence and she provided Harris with a prescription for Percocet,

advised Harris she would need to see pain management for further pain medication refills, and

advised Harris to follow up with neurosurgery.  Tr. 904.

     **2.**      **Medical statements and/or opinion evidence**

          **a.**      **Treating sources**

          *<u>Dr. Zakeri</u>*

On January 28, 2015, about four months post-surgery, Dr. Zakeri indicated that Harris's

leg symptoms had persisted but her spasms were improving.  Tr. 890.  She was neurologically

intact but straight leg raising caused low back pain.  Tr. 890.  Dr. Zakeri indicated that an MRI

taken post-surgery showed some scar tissue but no evidence of nerve root compression and x-

rays showed that the fusion was taking place.  Tr. 890.  Harris showed no abnormal movement

on flexion or extension.  Tr. 890.  Dr. Zakeri did recommend a CT to make sure there was no

loosening of her hardware.  Tr. 890.  He recommended that Harris continue with therapy.  Tr. 890.  He opined, "I don't think it is likely for her to be able to return to her current job, at least not for another three months or so."  Tr. 890.

### Dr. Frame

As part of Harris's workers compensation claim, from August 2012 through September 2013, Dr. Frame completed a number of reports regarding Harris's ability to work, indicating that she could return to work but with restrictions.  Tr. 458, 464-469, 473-474, 498-499, 508-509, 526-527, 536-537, 542-543, 570-571, 578-579, 589-590, 597-598, 614-615, 621-622.  Restrictions included working 5 hours per day for a total of 25 hours per week; having only an occasional ability to perform postural limitation such as bending, squatting, kneeling, twisting and turning; no climbing; lifting and carrying restrictions (occasionally lifting/carry up to 20 pounds and frequently lifting up to 10 pounds); pushing and pulling restrictions (occasionally pushing/pulling up to 25 pounds).  *See e.g.,* Tr. 468, 498, 508, 542, 589, 621.

### Dr. Palla

On April 1, 2015, Dr. Palla completed a check-box style form, entitled Work Restriction Report.  Tr. 898-899.  In that form, Dr. Palla opined that Harris could sit for a total of 2 hours at one time, stand for a total of 1 hour at one time, and walk for a total of 1 hour at one time.  Tr. 899.  Dr. Palla opined that Harris could sit for a total of 3-4 hours during an 8-hour workday, stand for a total of 2 hours during an 8-hour workday, and walk for a total of 1 hour during an 8-hour workday.  Tr. 899.  Dr. Palla also opined that Harris would need to change positions often and at will at irregular intervals; would need to leave her workstation once every hour for 10 minutes to move around and stretch; would likely miss 3 or more days of work per month due to exacerbations; and could lift/carry 7-8 pounds occasionally and 5 pounds frequently.  Tr. 899.

Dr. Palla rated Harris's pain as moderate, meaning that Harris's pain "[c]ould be tolerated but would cause marked hardship in the performance of the activity which precipitates the pain; would restrict ability to maintain concentration."  Tr. 899.

### *Nurse Desmond*

Nurse Desmond saw Harris at St. Luke's on August 8, 2012, and, as part of Harris's worker's compensation claim, completed a report regarding Harris's ability to work.  Tr. 450. Nurse Desmond opined that Harris could return to work with restrictions.  Tr. 450.  She opined that Harris could lift/carry up to 10 pounds continuously and up to 20 pounds occasionally; she could bend, twist/turn, and reach her knees occasionally; she could push/pull no greater than 20 pounds; and she should could not stand or walk for prolonged periods.  Tr. 450.

### b.    Consultative examiners

### *Dr. Deerhake*

As part of Harris's worker's compensation claim, Harris was evaluated in January 2013 by Richard H. Deerhake, MD, a physician who was board certified in orthopedic surgery.  Tr. 553-557.  The allowed worker's compensation condition at the time of the January 2013 evaluation was lumbar sprain.  Tr. 553.  Dr. Deerhake completed an initial report on January 24, 2013.  Tr. 553-557.  Thereafter, he prepared addenda to his initial report on March 25, 2013, and May 10, 2013, (Tr. 586-587, 591-593, 616), and, on September 3, 2013, he saw Harris again and completed an opinion regarding whether Harris had reached maximum medical improvement on her allowed worker's compensation claim (Tr. 616-619).

As part of his initial evaluation in January, Dr. Deerhake reviewed Harris's medical history and past treatment, including Dr. Frame's chiropractic treatment notes.  Tr. 554.  Dr. Deerhake noted the following regarding his January 2013 physical examination:

The physical examination reveals an obese, black female who has a great deal of herky-jerky weakness, positive Waddell[5] signs and difficulties ambulating down the hall without a very stiff-legged, left sided limp in a nonanatomic fashion. She does list some to the left when she stands erect. I am unable to get her to walk on her heels and toes. She basically refuses. She has a large amount of herky-jerkiness to her standing up and gait pattern. She needed assistance to get her up onto the examining table. She has no muscle weakness on manual motor muscle testing in the sitting position, however. Her hip motion on the left caused back pain in a nonanatomic distribution. She has a sensory decrease in the entire left lower extremity with no dermatomal pattern. Her reflexes arc equal and symmetrical. Her calf on the left side is ½" smaller than on the right.

It would appear that many of the claimant's symptoms are nonorganic in nature.

Tr. 555.

In response to specific questions regarding Harris's condition, Dr. Deerhake indicated that Harris's complaints were out of proportion to physical findings. Tr. 555, 556. He indicated that, if six months of chiropractic treatment had not corrected her problems, he would not recommend further chiropractic treatment. Tr. 556. Instead, Dr. Deerhake indicated that an evaluation by an orthopedic surgeon or neurosurgeon may be warranted to see if anything further could be done and stated that, since Harris had not been on medication, it might be beneficial for Harris to try nonsteroidal anti-inflammatory medication. Tr. 556. Dr. Deerhake opined that Harris was not capable of returning to work at the time and needed further evaluation. Tr. 556.

Dr. Deerhake was later asked to offer his opinion as to whether the worker's compensation claim should be allowed for the additional conditions of L4-5 spondylolisthesis and L4-5 stenosis. Tr. 586-587. On March 25, 2013, Dr. Deerhake responded to the follow up inquiry, stating in an addendum that there was insufficient evidence to substantiate a diagnosis of L4-5 spondylolisthesis and, while there was mild to moderate L4-5 stenosis shown on an MRI,

_____

[5] Waddell signs are "five signs indicating that a patient's low back pain is being intensified by psychological factors[.] *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1716. For example, "tenderness that is not localized but spread over a wide area . . . weakness or sensory disturbance that is not limited in a normal anatomic distribution . . ." *Id.*

the condition was a degenerative condition with no bearing or relationship to her work injury. Tr. 587.

Dr. Deerhake prepared a second addendum on May 10, 2013. Tr. 591-593. Dr. Deerhake was asked to opine as to whether the conditions of lumbar radiculopathy L4-5 (left), lumbar disc bulge/tear L4-5, and substantial aggravation of spinal stenosis L4-5 should be additionally allowed in Harris's worker's compensation claim. Tr. 591-592. Dr. Deerhake indicated that a diagnosis of L4-5 lumbar radiculopathy on the left was substantiated by the EMG study he reviewed and an MRI showed a lumbar disc/bulge at L4-5. Tr. 592. However, there was no evidence of substantial aggravation of spinal stenosis and Dr. Deerhake was of the opinion that he was unable to correlate her clinical findings on examination with the requested additional conditions, noting earlier in his report that, Harris's "findings are totally subjective and do not correlate well with anatomic clinical conditions that would be indicative of an active radiculopathy. There seems to be a lot of exaggeration of her findings. Attempting to substantiate whether the anatomical findings which were found on the EMG study and the MRI study are the sources of her problems is challenging." Tr. 592

On September 3, 2013, Dr. Deerhake saw Harris again to assess whether she had reached maximum medical improvement for the allowed claim of lumbar strain. Tr. 616-619. Harris complained of anterior thigh numbness. Tr. 617. She did not complain of pain radiating down to her heel, foot, calf or leg. Tr. 617. She used a cane for ambulation and indicated that ambulating for long periods of time aggravated her back pain. Tr. 617. Dr. Deerhake concluded that:

> After evaluation, again this claimant shows multiple signs of positive Waddell tests and signs and symptoms which are nonanatomic. In relation to the question, the only allowed condition in this claim is a lumbar strain. Normally sprains and strains will heal within 3 months, certainly within 6 months. It has now been 13 months since her original injury, and it would be my opinion that she has reached maximum medical improvement in regard to the lumbar strain[.]

14

Tr. 618-619.

### *Physical therapist A. Swartout*

On March 23, 2015, upon referral by Dr. Zakeri, physical therapist Andrew E. Swartout, DPT, saw Harris for a functional capacity evaluation ("FCE"). Tr. 896-897. Mr. Swartout indicated that Harris could not tolerate testing beyond repetitive movement tests secondary to pain levels. Tr. 896. He observed that Harris demonstrated abnormal neurological signs and symptoms and sensation changes of the left lower extremity. Tr. 896. Harris reported spasticity and stress incontinence. Tr. 896. Mr. Swartout indicated he "was unable to complete the FCE secondary to uncontrollable pain and deconditioning." Tr. 896. Per Mr. Swartout, reliability testing "suggest[ed] very poor effort or compromised effort which [was] not necessarily related to pain, impairment or disability." Tr. 896. Mr. Swartout indicated that other data should be considered in order to assist with determining Harris's actual functional ability and to assist with medical and vocational planning. Tr. 897.

### c.      State agency reviewers

On October 3, 2013, state agency reviewing physician Jeffrey Vasiloff, MD, completed a Physical RFC Assessment. Tr. 159-161. In that assessment, Dr. Vasiloff opined that, exertionally, Harris could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds; stand and/or walk for a total of 4 hours with the need for a medically required hand-held assistive device for ambulation; sit for about 6 hours in an 8-hour workday; and push/pull unlimitedly, other than as shown for lift/carry. Tr. 159. Dr. Vasiloff explained the exertional limitations, noting "[s]pinal arthritis with use of cane intermittently." Tr. 159. With respect to postural limitations, Dr. Vasiloff opined that Harris could occasionally climb ramps/stairs, balance, stoop,

kneel, crouch, and crawl.  Tr. 159-160.  Dr. Vasiloff also opined that Harris would have to avoid all exposure to hazards (machinery, heights, etc.).  Tr. 160.

Upon reconsideration, on January 20, 2014, state agency reviewing physician Elaine M. Lewis, MD, affirmed Dr. Vasiloff's Physical RFC Assessment.  Tr. 172-174.

**C.    Hearing testimony**

**1.    Plaintiff's testimony**

Harris testified and was represented at the hearing.  Tr. 109-139.  Harris explained that she was unable to work because of fatigue and pain in her legs.  Tr. 120.  She indicated that she sometimes uses a walker.  Tr. 120.  She also has spasms in her leg.  Tr. 121.  Also, her big toe and the two adjacent toes on her left foot stay numb.  Tr. 121.  To help with the spasms, Harris wears an air boot.  Tr. 121.  She was using a cane and wearing an air boot at the hearing.  Tr. 128, 139.  She also brought a pillow to the hearing because it helps with her back when she is sitting.  Tr. 139.  Harris estimated being able to walk from one end of the room to another.  Tr. 122.  The pain in her legs is a burning and sharp pain that starts in her groin area and goes down both legs.  Tr. 123.

Harris discussed her recent spinal fusion surgery, which was recommended by Dr. Zakeri.  Tr. 124-127.  Following surgery, Harris had physical therapy.  Tr. 126.  Initially after surgery, Harris was on bed rest.  Tr. 125.  With therapy, her condition improved a little but she still had pain.  Tr. 126.  Harris did not feel that her condition was better post-surgery than pre-surgery.  Tr. 127.  She feels that pain in her left leg is worse and she did not have to wear the air boot before surgery.  Tr. 127.  Her back pain following surgery is about the same as it was before surgery.  Tr. 131.  She was doing therapy in the pool and did indicate that she feels better after her therapy.  Tr. 127-128.  Harris uses a heating pad on her back for some relief.  Tr. 131.  Harris

uses a cane that was prescribed by a physical therapist.  Tr. 128.  She had the cane with her at the hearing and indicated that she uses the cane all the time, including at home.  Tr. 128-129.  She does not wear her boot the entire day while at home.  Tr. 129.  If she is at home, elevating her feet, she does not have to wear her boot.  Tr. 129.  Elevating her feet helps.  Tr. 129.  She can stay in a position with her feet elevated for about an hour to an hour and a half and then she has to get up.  Tr. 129.

Harris takes various medications, including Lyrica for the spasm in her leg, Tramadol for her back pain, and Zanaflex, a muscle relaxer.  Tr. 130.

Harris's two daughters drive her places because Harris's driver's license was suspended.  Tr. 111.  Harris indicated that, even if her license was not suspended, she would not drive because of the spasms that she gets in her leg.  Tr. 111.  Harris's daughters really help her a lot by taking care of things at the house.  Tr. 134-135, 138.  Harris reads a lot and has friends that come over to visit with her.  Tr. 135.  She watches television.  Tr. 135.  Harris goes grocery shopping with her daughter once a month.  Tr. 135.  When Harris goes shopping, she can walk around the store for about 25 minutes.  Tr. 138.  She visits her dad once a week and may go to her sister's house.  Tr. 136.  Harris goes to the YMCA to use the pool for therapy exercises.  Tr. 136.  Harris's pain wakes her up but she gets "a good six hours" of sleep.  Tr. 136.  She thinks she can lift a half gallon of milk without causing pain.  Tr. 137.  Harris tries to avoid stairs because climbing stairs brings spasms on her legs.  Tr. 137.

Harris used to enjoy bowling, going to the movies, and traveling places.  Tr. 138-139.  However, traveling has become too difficult because she cannot sit in a car for long distances without it bothering her back.  Tr. 139.  She can ride in a car for about 20-25 minutes.  Tr. 139.

2.      **Vocational expert's testimony**[6]

Vocational Expert Joseph L. Thompson ("VE") prepared a past work summary (Tr. 363) and testified at the hearing (Tr. 140-152).  In the past work summary, the VE identified Harris's past work as a warehouse worker as a medium, unskilled job and her cleaner job as a light, unskilled job.  Tr. 141, 363.  The ALJ asked the VE to also classify Harris's past work as a cashier and cook. Tr. 141.  The VE indicated that the cashier position was a light, unskilled position and the cook position was a light, semi-skilled position, which Harris performed at the medium level.  Tr. 141-142.

The ALJ asked the VE a series of hypothetical questions.  First, he asked the VE to assume a hypothetical individual Harris's age and education and with the past jobs that were described who is limited to light work, meaning the individual can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; sit/stand/walk up to 6 hours; push/pull as much as the individual can lift/carry; frequently stoop and climb ramps and stairs; occasionally kneel, crouch, and crawl; never climb ladders, ropes and scaffolds; never work with unprotected heights or moving mechanical parts; and limited to performing simple, routine and repetitive tasks and dealing with change in the work setting that involves simple, work-related decisions.  Tr. 142. The ALJ then asked the VE whether the described individual would be able to perform any of Harris's past work as described, as actually or generally performed.  Tr. 142.  The VE indicated that the cleaner and cashier positions would be available but the cook and receiving order filler position would be eliminated.  Tr. 143.

Harris's attorney followed up by asking the ALJ not to consider the cashier position because Harris performed that work incidentally to her cooking position.  Tr. 143.  The ALJ

---

[6] During the vocational expert's testimony, the ALJ noted for the record that Plaintiff was standing.  Tr. 144.

agreed to exclude the cashier part of that work and the VE indicated that the cleaner position still remained as available past work.  Tr. 143-144.  The ALJ then asked the VE whether the described individual could perform any other work in the national economy.  Tr. 144.  The VE identified three light, unskilled jobs, including folder, production inspector, and packer.  Tr. 144. The VE identified state and national job numbers for each of the identified jobs.  Tr. 144.

For his second hypothetical, the ALJ asked the VE to consider an individual who could perform less than a full range of light work, meaning that the individual can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; sit up to 6 hours but only stand and walk up to 4 hours; can push and pull as much as she can lift and carry; can frequently stoop; can occasionally use ramps and stairs, kneel, crouch and crawl; can never climb ladders, ropes and scaffolds; can only occasionally balance on uneven surfaces; can never work with unprotected heights or moving parts; can only occasionally work in an environment with vibration; and limited to performing simple, routine and repetitive tasks and to dealing with changes in the work setting that involve only simple work-related decisions.  Tr. 144-145.  The VE indicated that the described individual would be unable to perform Harris's past relevant work.  Tr. 145. The VE indicated that, with the restriction to 4 hours of standing and walking, in order for there to be work available in national economy, the individual would need to have the ability to sit or stand to perform the jobs.  Tr. 145.  The VE indicated that, although the DOT does not recognize a sit/stand option, based on his work with employers and knowledge of labor market conditions, there would be positions available that would allow for the ability to sit or stand, including production inspector and packer, two of the three previously identified jobs, but at reduced job numbers.  Tr. 146.  Also, the VE indicated that assembler, a light, unskilled job, would be available and the VE provided job numbers for the assembler position.  Tr.  146.

19

For his third hypothetical, the ALJ asked the VE to assume the second hypothetical except that the individual would also require the use of a cane to ambulate distances greater than 25 yards but not to ambulate shorter distances or to stand in place.  Tr. 146-147.  The VE indicated that past work would be eliminated.  Tr. 147.  The VE also indicated that the same three positions – production inspector, packer and assembler – would still be available at the same numbers that were reduced based on the sit/stand option.  Tr. 147.  The VE indicated that his testimony was not consistent with the DOT for the same reasons as explained in connection with the sit/stand option.  Tr. 147.

For his fourth hypothetical, the ALJ asked the VE to consider an individual who can perform sedentary work and requires a cane to ambulate distances greater than 25 yards but not to ambulate shorter distances or stand in place; can frequently stoop; can only occasionally climb ramps and stairs; can never climb ladders, ropes and scaffolds; can never kneel, crouch, crawl or balance on uneven surfaces; can only occasionally work in an environment with vibration but never with unprotected heights or moving mechanical parts; limited to performing simple, routine, repetitive tasks; and limited to dealing with changes in a work setting involving simple, work-related decisions.  Tr. 147-148.  The VE indicated that the described individual would be unable to perform Harris's past work but there would be sedentary, unskilled jobs in the national economy that the described individual could perform, including order clerk, bench worker, and assembler.  Tr. 148.  The VE identified state and national job numbers for each of the identified jobs.  Tr. 148

For his final hypothetical, the ALJ asked the VE to assume the individual in the sedentary hypothetical with the same limitations and an additional limitation of only being able to stay on task 80% of the workday excluding normal breaks and lunch.  Tr. 149.  The VE indicated that

the additional limitation would eliminate all work.  Tr. 149.  The VE indicated that breaks and off-task requirements are not addressed in the DOT but his testimony was based on his work with employers and knowledge of labor market conditions.  Tr. 149-150.

Harris's counsel asked the VE whether, when classifying Harris's cleaner position, he had accounted for the supervisory role associated with that position.  Tr. 150.  The VE indicated that he had not and that a cleaning supervisor or janitorial supervisor had a different DOT code than cleaner.  Tr. 150.  The VE then explained that the supervisor position was a medium, skilled position.  Tr. 150.  Based on the VE's responses regarding the cleaner position, Harris's counsel asked that the ALJ not consider the cleaner position as available past relevant work for any of the hypotheticals because it exceeds both the skill and exertional level of the hypothetical questions.  Tr. 150.  Harris's counsel indicated that Harris was seeking a finding that she was unable to perform any of her past relevant work.  Tr. 150-151.

Harris's counsel then proceeded to ask the VE to consider an individual who is the same age and has the same education and past relevant work as Harris who can sit for 2 hours at a time or for 3-4 hours total; can stand for an hour at a time or 2 hours total; can walk for an hour at a time or for an hour total; needs to change positions often and at will by alternating between sitting, standing and lying down at irregular intervals; and needs to leave work station periodically at least once every hour for 10 minutes to move about and stretch.  Tr. 151.  The VE indicated that there would be no work because the sitting, standing and walking criteria was less than full-time employment; the lying down aspect of the hypothetical would not be consistent with competitive employment; and being off task one time every hour for 10 minutes would result in being off task more than 20% of the workday.  Tr. 151-152.

In response to further questioning by Harris's counsel, the VE indicated that missing three or more days of work per month due to exacerbations would eliminate all employment because it was exceed the norm of one to two days per month.  Tr. 152.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his April 24, 2015, decision, the ALJ made the following findings:[8]

1.     Harris meets the insured status requirements of the Social Security Act through December 31, 2017.  Tr. 81.

2.     Harris has not engaged in substantial gainful activity since August 8, 2012, the alleged onset date.  Tr. 81.

3.     Harris has the following severe impairments: mood/affective/depressive disorder; degenerative disc disease with stenosis and spondylosis, status post-fusion surgery; obesity.  Tr. 81-82.

4.     Harris does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 82-84.

5.     Harris has the RFC to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit up to 6 hours; stand and walk up to 4 hours; requires a cane to ambulate distances greater than 25 yards, but not to

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[8] The ALJ's findings are summarized.

ambulate shorter distances or to stand in place; can push and pull as much as she can lift and carry; can frequently stoop, but only occasionally use ramps and stairs, kneel, crouch and crawl; can never climb ladders, ropes, and scaffolds; can only occasionally balance on uneven surfaces; should never work with unprotected heights or moving parts and occasionally in an environment with vibration; and would be limited to performing simple, routine and repetitive tasks, and to dealing with changes in the work setting that involve simple work-related decisions.  Tr. 85-91.

6.      Harris is unable to perform past relevant work.  Tr. 91.

7.      Harris was born in 1965 and was 47 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Harris subsequently changed age category to closely approaching advanced age. Tr. 92.

8.      Harris has at least a high school education and is able to communicate in English.  Tr. 92.

9.      Transferability of job skills is not an issue.  Tr. 92.

10.     Considering Harris's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Harris can perform, including production inspector, packer, and assembler.  Tr. 92.

Based on the foregoing, the ALJ determined that Harris had not been under a disability, as defined in the Social Security Act, from August 8, 2012, through the date of the decision.  Tr. 93.

### V. Plaintiff's Arguments

Harris argues that the ALJ erred at Step Four by not establishing the physical and mental demands of her past relevant work.  Harris also argues that the ALJ erred at Step Three by not properly considering her impairments under Listing 1.04.[9]

---

[9] In her "conclusion," Harris appears to raise a sentence six argument based on alleged new and material evidence. Doc. 13, p. 18.  However, Harris makes no attempt to develop this argument.  Accordingly, the undersigned has not addressed it.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.    The Court should find no error with respect to the ALJ's assessment of Harris's past relevant work

Harris argues that reversal and remand is required because the ALJ erred at Step Four by not establishing the particular physical and mental demands of her past work experience. Doc. 13, pp. 14-15, Doc. 15, pp. 1-2. She contends that pursuant to SSR 82-62, *A Disability*

25

*Claimant's Capacity To Do Past Relevant Work, In General*, 1982 WL 31386 (1982), the ALJ was required to list or describe the physical and mental demands of her prior work.

SSR 82-62 provides, in part, "In finding that an individual <u>has</u> the capacity to perform a past relevant job, the . . . decision must contain . . . 2. A finding of fact as to the physical and mental demands of the past job/occupation." SSR 82-62, 1982 WL 31386, * 4 (emphasis supplied). Here, the ALJ found that "[t]he demands of the claimant's past relevant work exceed[ed] the limitations detailed in the claimant's residual functional capacity." Tr. 91. Thus, the ALJ concluded that Harris was unable to engage in her past relevant work and proceeded to Step Five of the sequential evaluation process. Tr. 91. Since the ALJ concluded that Harris could <u>not</u> perform her past relevant work, Harris has failed to show that the ALJ erred by not specifically listing in his decision the physical and mental demands of her past work.

Moreover, the VE testimony, which the ALJ relied upon to support his Step Four determination (Tr. 91), addressed the exertional and skill levels of Harris's past relevant work and reasons why past relevant positions would not be available to various hypothetically described individuals (Tr. 141-144, 145, 147, 148, 150, 151, 363). Harris has not argued or shown that the VE's testimony or description of her past relevant work was incorrect.

For the above reasons, the undersigned recommends that the Court find no error with respect to the ALJ's assessment of Harris's past relevant work.

**B.**     **The Court should find no error with respect to the ALJ's Step Three determination**

Harris argues that the ALJ erred at Step Three by concluding that her impairments did not satisfy Listing 1.04. Doc. 13, pp. 15-17, Doc. 15, pp. 3-6. She contends that the medical evidence satisfies Listing 1.04.

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a Listing. *Thacker v. SSA*, 93 Fed. Appx. 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)). Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker* 93 Fed. Appx. at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'" *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011). "A claimant must satisfy all the criteria to 'meet' the listing." *Id.* "[A]claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id.* (emphasis in original). In assessing equivalency, an ALJ "looks to the opinions of the state agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the medical findings are at least equal in severity and duration of the listing findings." *Johnson v. Colvin*, 2014 WL 1418142, *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. § 404.1526).

Listing 1.04 provides:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

27

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Section 1.00B2b of the listing states:

b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

At Step Three, the ALJ analyzed Harris's impairments under various listings, including 1.04, and concluded that Harris did not have an impairment or combination of impairments that met or equaled the criteria for any listed impairment.  Tr. 82-83.   The ALJ stated:

> The limitations of the claimant do not satisfy the terms of listing 1.04 for disorders of the spine. The claimant is not so functionally limited and the evidence does not support the medical findings required by listing 1.04 such as a condition that results in compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging and manifested by chronic pain and weakness.

Tr. 82-83.

Harris contends that there is medical evidence, including MRI results, EMG/NCV studies, physical examination findings, and use of a straight cane for ambulation, that demonstrates that her impairments meet or equal Listing 1.04 and she argues that the ALJ failed to address any of this evidence in his Step Three discussion.  Harris references subsections (A), (B), and (C) of Listing 1.04 in the section heading portions of her brief but her argument is focused on Listing 1.04(A) (Doc. 13, pp. 16-17 (citing language from Listing 1.04(A)), Doc. 15, p. 3 (citing language from Listing 1.04(A)) and her claim that the ALJ skipped an entire step of the necessary disability analysis.

The ALJ did not miss an entire step of the necessary disability analysis.  As reflected above, the ALJ discussed Listing 1.04 and specifically referred to criteria in that listing that the ALJ concluded were not supported by the evidence.  The ALJ's Step Three analysis is supported by his later detailed discussion of the medical evidence.  For example, in order to satisfy Listing 1.04(A), there must be evidence of nerve root compression.  However, as indicated by the ALJ, in January 2015, following surgical intervention, Harris's treating physician Dr. Zakeri concluded that there was no evidence of nerve root compression.  Tr. 88, 890.  Harris does not

contend that the ALJ misinterpreted Dr. Zakeri's finding. She argues that there was other evidence showing stenosis involving nerve compression and encroachment. Doc. 15, p. 5, n. 12 (citing Tr. 393-395, 658-660). However, the records Harris cites to in support of the foregoing assertion do not clearly support her claim. In fact, one of the medical records referred to is an October 29, 2014, letter from Dr. Zakeri which indicates that the post-surgical MRI showed no encroachment by the hardware. Tr. 660. Another record is a December 3, 2014, letter from Dr. Zakeri which indicates that x-rays showed good alignment and no abnormal movement on flexion and extension. Tr. 659. Moreover, the ALJ considered the entirety of the record and, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. In light of the foregoing, the undersigned finds that Harris is unable to demonstrate that the ALJ's Step Three finding as it relates to Listing 1.04(A) is unsupported by substantial evidence and/or is not sufficiently explained to allow meaningful review by the Court.

To the extent that Harris contends that there is evidence to satisfy Listing 1.04(B), her claim fails. Listing 1.04(B) requires evidence of "[s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging . . ." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. In what appears to be an attempt to argue that her impairments satisfy Listing 1.04(B), Harris asserts that an October 25, 2012, MRI shows evidence of "granulation tissue deposition" and that unnamed medical experts "have testified that evidence of granulation and scar tissue around the nerve root can be consistent with arachnoiditis." Doc. 13, p. 16. This argument is both cursory and speculative and does not confirm spinal arachnoiditis as is required by the listing.

To the extent that Harris claims that there is evidence to satisfy Listing 1.04(C), her claim also fails.  Listing 1.04(C) requires "Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  While the ALJ's Step Two finding recognizes stenosis, Harris has not identified the evidence that demonstrates pseudoclaudication.  Nor has she shown that the evidence establishes an inability to ambulate effectively as defined in § 1.00B2b.  Ineffective ambulation is "defined generally as having insufficient lower extremity functioning. . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.00B2b(1) (emphasis supplied); *see also* 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A1, § 1.00B2b(2) ("[E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without . . . two canes . . .").  Harris notes her need to use a rolling walker post-surgery (Doc. 13, p. 16) but has not pointed to evidence indicating a permanent need for a rolling walker.  Also, while Harris uses a cane and a CAM boot, she has not shown that use of a cane or CAM boot limits the functioning of both of her upper extremities.  Further, as indicated by the ALJ, while Harris used a cane and CAM boot at the hearing, she acknowledged that she had the ability to ambulate short distances without use of an assistive device.  Tr. 91, 122.  Further, to the extent that Harris relies on her own subjective complaints regarding pain and weakness to establish a listing level impairment under Listing 1.04(C), the ALJ considered those allegations and discounted them, in part, based on Dr. Deerhake's findings that Harris's subjective complaints were not demonstrated clinically and were totally subjective.  Tr. 90, 91.

In addition to reviewing and considering the medical evidence, the ALJ considered and weighed the medical opinion evidence, including the opinions of the state agency reviewing physicians, who reviewed the record and found no listing level impairment.  The ALJ assigned great weight to the opinions of the state agency reviewing physicians (Tr. 90) and Harris has not challenged the assignment of that weight.  Tr. 159-161, 172-174.

Considering the foregoing, the undersigned finds that the ALJ properly considered Harris's impairments under Step Three and the ALJ's Step Three finding that Harris's impairments did not meet or equal Listing 1.04 is supported by substantial evidence.  Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's Step Three determination.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

December 4, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).